**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 18-cv-1930-WJM-STV

ERIC ST. GEORGE,

     Plaintiff,

v.

CITY OF LAKEWOOD, COLORADO;
DEVON TRIMMER, a/k/a DEVON MYERS;
JASON MAINES;
JEFF LARSON; and
DAN McCASKY,

     Defendants.

---

**ORDER ADOPTING AS MODIFIED MAY 13, 2019 RECOMMENDATION OF
MAGISTRATE JUDGE GRANTING DEFENDANTS' MOTION TO DISMISS**

---

This matter is before the Court on United States Magistrate Judge Scott T. Varholak's Recommendation dated May 13, 2019 (the "Recommendation"; ECF No. 62), which recommended that this Court grant Defendants' Motion to Dismiss (ECF No. 30). The Recommendation is incorporated herein by reference. *See* 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b). Plaintiff Eric St. George ("St. George" or "Plaintiff") filed an Objection to the Recommendation ("Objection"; ECF No. 63), to which Defendants responded (ECF No. 64).

For the reasons set forth below, the Recommendation is adopted as modified, St. George's Objection is overruled, and Defendants' Motion to Dismiss is granted.

# I. LEGAL STANDARD

When a magistrate judge issues a recommendation on a dispositive matter, Federal Rule of Civil Procedure 72(b)(3) requires that the district judge "determine de novo any part of the magistrate judge's [recommendation] that has been properly objected to." An objection to a recommendation is properly made if it is both timely and specific. *United States v. 2121 East 30th St.*, 73 F.3d 1057, 1059–60 (10th Cir. 1996). An objection is sufficiently specific if it "enables the district judge to focus attention on those issues—factual and legal—that are at the heart of the parties' dispute." *Id.* at 1059. In conducting its review, "[t]he district judge may accept, reject, or modify the [recommendation]; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3). Here, St. George filed a timely objection to the Recommendation. (ECF No. 63.) *See also Price v. Philpot*, 420 F.3d 1158, 1163–67 (10th Cir. 2005) (discussing the prison mailbox rule). Therefore, the Court reviews the issues before it *de novo*, except where otherwise noted.

In considering the Recommendation, the Court is also mindful of St. George's *pro se* status, and accordingly, reads his pleadings and filings liberally. *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972); *Trackwell v. United States*, 472 F.3d 1242, 1243 (10th Cir. 2007). The Court, however, cannot act as advocate for St. George, who must still comply with the fundamental requirements of the Federal Rules of Civil Procedure. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991); *see also Ledbetter v. City of Topeka*, 318 F.3d 1183, 1188 (10th Cir. 2003).

## II. BACKGROUND

The following factual summary is drawn from St. George's Affidavit ("Affidavit"; ECF No. 14-2) that he submitted with his Third Amended Complaint (ECF No. 14-1).[1] The Court assumes the allegations contained in the Affidavit to be true for the purpose of deciding the Motion to Dismiss. *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

The events that give rise to this lawsuit began on July 31, 2016. (¶ 1.)[2] That evening, St. George browsed a website "known for advertising prostitutes and sex workers," and ordered the services of an escort. (¶¶ 1–3.) At approximately 9:00 p.m., the escort arrived at St. George's residence in Lakewood, Colorado. (¶ 2.) Based upon the advertised price of $220 for one hour of service, St. George had placed $220 in cash on his kitchen counter, which the escort took upon her arrival. (¶ 3.)

After performing 30 minutes of the one-hour service, the escort announced her intent to leave. (¶ 6.) St. George demanded his money back but did not "'grab her' or physically restrain her in any way." (*Id.*) The escort refused to return the money and pushed St. George as she exited the residence. (*Id.*) Fearing that he was being robbed and that the escort "had a pimp or a bouncer" waiting outside, St. George

---

[1] St. George's Third Amended Complaint is a morass of claims but very few factual allegations. (*See generally* ECF No. 14-1; *see also* ECF No. 54 at 3 ("Plaintiff concedes that his Third Amended Complaint is a 'quagmire of claims.'").) The few factual allegations contained in the Third Amended Complaint are presented in a particularly disjointed manner, such that the Court would be unable to decipher the background underlying this lawsuit by solely looking to that filing. (*See generally* ECF No. 14-1.) The Affidavit, on the other hand, presents St. George's factual allegations in a much more clear and thorough manner. (*Compare* ECF No. 14-2, *with* ECF No. 14-1.) As a result, the Court derives the following factual summary from St. George's Affidavit.

[2] All "¶" citations, without more, are to the Affidavit (ECF No. 14-2).

grabbed a small handgun from his pants on the floor and pursued the escort. (¶¶ 7–9 (internal quotation marks omitted).) When she was within feet of her vehicle, the escort turned to confront St. George with a can of mace. (¶ 9.) St. George "raised his arm overheard [and] fired on[e] round up into the air, warning away [the escort's] imminent attack." (*Id*.) St. George then lowered his arm and took aim at the escort, but did not fire. (¶¶ 9–11.) The escort fled and St. George proceeded "to a local restaurant for dinner and drinks." (¶¶ 9, 12.)

At 10:09 p.m., approximately twenty minutes after St. George fired his handgun, the escort contacted the Lakewood Police Department ("LPD") to report that St. George had "made illicit sexual contact" with her and had fired two gunshots—"one in the air, and a second false gunshot aimed at her." (¶ 11.) St. George was unaware that the escort had called the police, but he did anticipate that his neighbors might have contacted law enforcement to report the sound of a gunshot. (¶¶ 13–14.)

Four LPD officers responded to the scene at 10:13 p.m., and parked their vehicles in a location that could not be observed from St. George's residence. (¶¶ 15–16.) Among these officers were Defendants Agent Devon Trimmer ("Agent Trimmer") and Sergeant Jason Maines ("Sergeant Maines"). (¶ 16.) At approximately 11:15 p.m., St. George returned home from dinner but did not see any "people or strange vehicles . . . in the immediate area around [his residence]." (*Id*.)

At 12:17 a.m., LPD officers attempted to contact St. George by phone using a blocked number, but St. George did not answer. (¶ 17.) The officers tried again at 12:20 a.m., and this time St. George answered and spoke with one of the officers for 2 minutes and 32 seconds. (¶ 19.) During the phone call, the officer identified himself as

4

an agent with the LPD and instructed St. George "to come outside to talk to [the] Police." (*Id*.) St. George opened his front door and looked outside, but could not see any police officers or police vehicles because they were hiding around the corner of the building. (¶ 20.)

At 12:23 a.m., LPD officers made a third phone call to St. George using a blocked number, but St. George did not answer. (¶ 21.) The officers tried again at 12:24 a.m., and this time St. George answered and spoke with one of the officers for 5 minutes and 5 seconds. (¶ 22.) During the phone call, the officer identified himself as a sergeant with the LPD and informed St. George that the officers knew he was inside the residence because the officer's "friends" were in the backyard and could see St. George through the windows. (*Id*. (emphasis omitted).) The officer also told St. George to come outside to talk to the police. (*Id*.) The officer reported that St. George was "'upset', 'unsettled,' and 'paranoid,'" and that St. George did not believe that the call was from the police. (¶ 23.)

At 12:30 a.m., LPD officers called St. George for a fifth time using a blocked number. (¶ 24.) St. George did not answer the call, but instead exited his backyard door unarmed to investigate the presence of the officer's "friends." (¶¶ 25, 28 (emphasis omitted).) Sergeant Maines and Agent Trimmer were in the backyard but St. George could not see them as they were "hiding in the shadows along the fenceline." (¶ 26.) Sergeant Maines reported that St. George "looked tentative" and Agent Trimmer reported that St. George had a cell phone in his hands. (¶¶ 27–28.) At 12:32 a.m., St. George went back inside his home after seeing "no reasonable sign of police presence." (¶¶ 30–31.) Sergeant Maines radioed that the officers had not yet

made contact with St. George, that "he came out, looked around, went back in real quick" and locked the door.  (¶¶ 29, 31.)

At 12:32 a.m., LPD officers called St. George for the sixth time.  (¶ 32.) St. George answered and spoke with one of the officers for 5 minutes and 54 seconds. (¶¶ 32–33.)  During the phone call, the officer identified himself as a police officer and told St. George that the police were outside his residence.  (¶ 32.)  Having not seen the police on his two previous trips outside, St. George told the officer "you aren't (out) there."  (*Id*. (parenthetical in original).)  The officer proceeded to tell St. George to come back outside with "nothing in his hands," to which St. George responded, "I have something in my hands."  (¶ 33.)  The officer then conveyed on the police radio that St. George was "being threatening on the phone."  (*Id*.)

Believing that somebody was "impersonating [the] police to lure him out for an attack,"  St. George grabbed a shotgun and exited the door to his backyard at 12:38 a.m.  (¶¶ 34–35.)  Once outside, St. George "loudly pumped the action of his shotgun, ejecting a live shell onto the ground," so as to "announc[e] his presence."  (¶ 36.)  Agent Trimmer radioed, "Did you hear that gun rack?"  (*Id*.)  Sergeant Maines responded, "Okay, yeah, send us some more cars, [St. George] just came out and racked a gun." (¶ 38.)  Sergeant Maines and Agent Trimmer then moved around the east side of the building to the front, with Agent Trimmer hiding behind a truck in the communal driveway and Sergeant Maines hiding behind foliage.  (¶¶ 38–39, 49.)

Sergeant Maines then radioed: "Is there somebody standing on the West side of the building . . . , where the backyards are?  Is that one of you guys?"  (¶ 41.)  "Due to darkness, [St. George] could not be discerned from a police officer, by a police officer,

6

that knew there were police officers on scene." (*Id.*)

At 12:43 a.m., St. George "began to walk from the backyard to the front side of the building, around the East end of the building." (¶ 42.)  Seconds later, Sergeant Maines radioed: "Alright Devon (Trimmer), he's coming East, he's walkin' fast, straight towards you." (¶ 43 (parenthetical in original).)  Still hiding behind the truck, Agent Trimmer heard Sergeant Maines's warning, followed by "the sound of crunching gravel and footfalls." (¶ 45.)  Agent Trimmer then observed St. George "walking through the communal driveway" at the front of his residence, with his shotgun "pointed downward in the 'low ready' condition." (¶ 46.)  When St. George "came into her view," Agent Trimmer "opened fire on him" and shot him in the leg. (¶ 47.)  In the approximately six minutes between the time St. George exited his residence and when he was shot by Agent Trimmer, none of the LPD officers announced a warning or told him to drop his weapon. (¶¶ 35–48.)

St. George returned fire on Agent Trimmer from a position in the street but missed, with his "shotgun pellets str[iking] the garage door above Trimmer's location." (¶¶ 48–49.)  Agent Trimmer retreated around the truck and then fired a second round at St. George but missed, striking the street. (¶ 50.)  St. George again returned fire on Agent Trimmer from the "end of the communal driveway." (¶ 51.)  Agent Trimmer then fired a third round at St. George, again missing. (¶ 52.)  St. George began to run back toward his residence but stumbled on the curb and fell into the grass. (¶ 53.)  Sergeant Maines, who was hiding behind a nearby bush, activated a flashlight under the barrel of his handgun and aimed the weapon at St. George. (¶ 54.)  "[T]hreatened by a second unidentified armed assailant," St. George sat up and fired three rounds at Sergeant

7

Maines, with each round missing its target.  (¶¶ 55–56.)

St. George then retreated back into his residence at 12:45 a.m. and called 911. (¶¶ 58–59.)  During the phone call, St. George informed the police dispatcher that he had been shot by an unknown assailant and that he had returned fire.  (¶ 59.)  Between 12:55 a.m. and 12:57 a.m., LPD officers conveyed over the radio that they were hearing additional gunfire—up to four shots.  (¶¶ 62–64.)  The fourth and final shot was fired into the ceiling of the breezeway outside St. George's front door when the door was opened by LPD officers.  (¶ 64.)  St. George was taken into custody at 1:00 a.m and formally arrested later at a hospital.  (¶¶ 64–66.)  At the time of the incident, LPD officers did not have in their possession an arrest warrant for St. George.  (¶ 66.)

Defendants Detective Jeff Larson ("Detective Larson"), LPD Chief of Police Dan McCasky ("Chief McCasky"), and the City of Lakewood are not mentioned in the Affidavit describing the events of this lawsuit.  (*See generally* ECF No. 14-2.)  The allegations against them are contained only in the Third Amended Complaint.  (ECF No. 14-1.)  Detective Larson allegedly created a "false narrative" about St. George's role in the firefight, which was used during St. George's criminal trial.  (*Id*. at 14–17.)  Detective Larson's false narrative included allegations that St. George (1) fired a round into the ceiling outside his front door while chasing the escort; (2) fired a second round at the escort "in an attempt to kill her"; and (3) fired his weapon at Agent Trimmer before she fired at him.  (*Id*.)  Chief McCasky allegedly "approved, and trained his staff" in numerous customs and policies that St. George contends are unconstitutional.  (*Id*. at 17–19.)  The City of Lakewood allegedly failed to adequately train its police officers, and established unconstitutional customs for its police department.  (*Id*. at 19–22.)

8

## III. PROCEDURAL HISTORY

On July 30, 2018, St. George filed the instant action. (ECF No. 1.) St. George's currently operative complaint is his Third Amended Complaint, wherein he asserts numerous federal and state causes of action against each Defendant. (ECF No. 14-1.) On December 3, 2018, United States Senior District Judge Lewis T. Babcock issued an Order to Dismiss in Part and to Draw Case, wherein Judge Babcock dismissed a variety of St. George's claims and other requests. (ECF No. 17.) These included St. George's demand to appoint a special prosecutor, a claim for declaratory judgment, all asserted criminal claims, and all claims relating to a 42 U.S.C. § 1985 conspiracy. (*See id*.)

As a result of Judge Babcock's order, St. George's remaining claims include: (1) excessive use of force against Agent Trimmer; (2) failure to prevent excessive force against Sergeant Maines; (3) supervisory liability for excessive force against Chief McCasky; (4) municipal liability for excessive force against the City of Lakewood; (5) denial of due process against all Defendants; and (6) various state law tort claims against all Defendants.[3] (ECF No. 14-1; *see also* ECF No. 62 at 5; ECF No. 54 at 1–2.)

On January 31, 2019, Defendants moved to dismiss all of St. George's remaining claims. (ECF No. 30.) The undersigned referred the Motion to Judge Varholak, who issued his Recommendation on May 13, 2019. (ECF No. 62.) On May

---

[3] In his response to the Motion to Dismiss, St. George acknowledged that these were his only remaining claims after Judge Babcock's order. (ECF No. 54 at 1–2.) In the Recommendation, Judge Varholak likewise found that the above-listed claims were St. George's only remaining claims. (ECF No. 62 at 5.) In his Objection, St. George does not dispute this determination. (*See generally* ECF No. 63.) Therefore, the Court finds that all other claims asserted in the Third Amended Complaint have been dismissed, and that the above-listed claims are St. George's only remaining claims.

28, 2019, St. George filed an Objection to the Recommendation.  (ECF No. 63.)

## IV.  EXCESSIVE FORCE CLAIMS

**A.**     **Excessive Force Claim Against Agent Trimmer**

St. George seeks relief under 42 U.S.C. § 1983 for the alleged use of excessive force by Agent Trimmer, in violation of his Fourth Amendment rights.  (ECF No. 14-1 at 6–7.)

"[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989).  Under this standard, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id*. at 396; *see also Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015).  Thus, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Graham*, 490 U.S. at 397.

"In determining the reasonableness of the manner in which a seizure is effected, '[courts] must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'"  *Scott v. Harris*, 550 U.S. 372, 383 (2007) (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)).  This balancing test "requires careful attention to the facts and circumstances of each particular case, including [1] the severity of the

crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396; *see also Lundstrom v. Romero*, 616 F.3d 1108, 1126 (10th Cir. 2010) (referring to the *Graham* factors as the "three, non-exclusive factors relevant to [an] excessive force inquiry").

The Court's "balancing must always account 'for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Pauly*, 874 F.3d at 1215 (quoting *Graham*, 490 U.S. at 396–97). "Ultimately, 'the inquiry is always whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force.'" *Pauly*, 874 F.3d at 1215 (quoting *Estate of Larsen v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008)).

St. George claims that Agent Trimmer used excessive force when she shot him in the leg. (ECF No. 14-1 at 6.) To analyze the reasonableness of Agent Trimmer's actions, the Court turns to the seminal three factor test from *Graham*. 490 U.S. at 396.

1.    The First *Graham* Factor

Under the first *Graham* factor, courts examine "the severity of the crime at issue." *Id*. In analyzing the factor, the Recommendation discussed how Agent Trimmer was responding to a 911 call alleging that St. George had made "illicit sexual contact" with a woman and that he had fired two gunshots during the incident, with the second gunshot aimed at the woman. (ECF No. 62 at 11.) Thus, the Recommendation found that the underlying crime Agent Trimmer was investigating was "undoubtedly serious." (*Id*.)

The Recommendation noted that although St. George "maintains that the sexual contact was consensual and that he had only fired a single shot into the air, the reasonableness of Agent Trimmer's conduct must be determined based upon 'what the officer knew at the time, not with the 20/20 vision of hindsight.'" (*Id*. at 11 n.2 (quoting *Kingsley*, 135 S. Ct. at 2473).) The Recommendation also discussed how St. George "does not allege any facts available to Agent Trimmer at the time that would have put her on notice . . . that the escort was providing false information." (ECF No. 62 at 11 n.2.) As a result, Judge Varholak found that the first *Graham* factor weighs in favor of Agent Trimmer. (*Id*. at 11.)

In the Objection, St. George's bases his arguments on the Tenth Circuit's analysis of the first *Graham* factor in *Pauly*, 874 F.3d at 1215. (ECF No. 63 at 3–4.) In *Pauly*, the suspect was involved in a road rage incident with two females on an interstate highway. 874 F.3d at 1203. The two females called 911 to report that the suspect was drunk behind the wheel, and then began to follow the suspect, apparently tailgating him. *Id*. The suspect pulled over at an off-ramp and the two females followed suit. *Id*. The suspect "felt threatened by the women and asked them why they were following him with their bright lights on." *Id*. The suspect then left the off-ramp and drove a short distance to his home. *Id*.

Police officers subsequently arrived at the off-ramp, but by then the suspect had already left the scene. *Id*. The officers spoke to the two women and "all agreed that there was not enough evidence or probable cause to arrest [the suspect], and that no exigent circumstances existed at the time. Nevertheless, the officers decided to to try and

speak with [the suspect] to get his side of the story, 'to make sure nothing else happened,' and to find out if he was intoxicated." *Id*. at 1203–04.  The officers then proceeded to the suspect's house, where the officers fatally shot the suspect's brother during a standoff.  *Id*. at 1204–05.

In analyzing the first *Graham* factor, the Tenth Circuit discussed how once the officers arrived at the scene in response to a call concerning road rage, "the Officers did not believe any exigent circumstances existed," and they "did not have enough evidence or probable cause to make an arrest."  *Id*. at 1215.  The Tenth Circuit then found that the first *Graham* factor weighed against the officers because it was "unclear from the record what, if any, crime was committed," and "[a]t best, the incident might be viewed as a minor crime such as reckless driving or driving while intoxicated."  *Id*. at 1215 & n.5 ("Under New Mexico law, reckless driving and driving while intoxicated (first offense) are misdemeanor offenses.").

Relying on *Pauly*, St. George argues that while the escort's allegations against him were "serious, it did not rise to the level of probable cause," and gave Agent Trimmer nothing more than "reasonable suspicion."  (*Id*. at 3.)  In support, St. George discusses a case from the Ninth Circuit analyzing when a 911 call supports "reasonable suspicion" to justify an investigatory stop.  (*Id*. at 3–4 (discussing *United States v. Edwards*, 761 F.3d 977, 983 (9th Cir. 2014)).)  St. George argues that the analysis from *Edwards* is applicable here and thus Agent Trimmer had only reasonable suspicion as a result of the escort's 911 call.  (ECF No. 63 at 4.)  However, St. George asserts that Agent Trimmer, like the officers in *Pauly*, "lacked probable cause to support that any

crime had taken place." (*Id.*) St. George claims that without probable cause to support the escort's allegations, the "'severity of the crime' factor can't be judged to weigh in Trimmer's favor." (*Id.* at 4.)

The Court finds St. George's arguments to be unconvincing. Indeed, "when analyzing *Graham*'s first prong, a court must assume that the crime for which the officer believes he has probable cause is valid." *McGarry v. Bd. of Cty. Comm'rs for Lincoln*, 294 F. Supp. 3d 1170, 1196 (D.N.M. 2018) (citing *Morris v. Noe*, 672 F.3d 1185, 1195 & n.4 (10th Cir. 2012)). Accordingly, courts are to "consider[ ] what crime the law enforcement officer asserts is at issue *without analyzing whether he had probable cause for that arrest*." *McGarry*, 294 F. Supp. 3d at 1196–97 (emphasis added) (citing *Morris*, 672 F.3d at 1195).

Moreover, it is readily apparent that St. George has misconstrued the first *Graham* factor as his analysis focuses not on "the severity of the crime at issue," but instead on whether the officer had probable cause that the crime at issue was committed. This is not the test articulated in *Graham*. 490 U.S. at 396. Similarly, the Court also finds that St. George has misread the crux of the holding in *Pauly* regarding the first *Graham* factor—namely, that the factor weighed in the suspect's favor because he had committed, "[a]t best, . . . a minor crime." *Pauly*, 874 F.3d at 1215; *see also id*. at 1215 n.5 (discussing how the "minor crimes" at issue were misdemeanors).

Here, the crimes at issue were undeniably serious. Agent Trimmer arrived on scene to investigate a 911 call concerning "illicit sexual contact" and gunfire, with a gunshot allegedly being fired at an individual. (¶ 11.) Indeed, St. George even

concedes in his Objection that the allegations against him were "serious." (ECF No. 63 at 3.) Notably, this case did not merely involve "misdemeanor [traffic] offenses." *See Pauly*, 874 F.3d at 1215 & n.5. Rather, the crimes at issue in this case were much more serious, and potentially included, *inter alia*, attempted second-degree murder (felony), Colo. Rev. Stat. § 18-3-103(1); menacing with use or suggested use of a deadly weapon (felony), Colo. Rev. Stat. § 18-3-206(1)(a)-(b); illegal discharge of a firearm (felony), Colo. Rev. Stat. § 18-12-107.5(1); prohibited use of a firearm (misdemeanor), Colo. Rev. Stat. § 18-12-106(1)(a)-(b); and unlawful sexual contact (misdemeanor), Colo. Rev. Stat. § 18-3-404. *See also Clark v. Bowcutt*, 675 F. App'x 799, 807 (10th Cir. 2017). As a result, the Court the agrees with the Recommendation and finds that the first *Graham* factor weighs in favor of Agent Trimmer.

2.      The Second *Graham* Factor

The second *Graham* factor, "whether the suspect pose[ed] an immediate threat to the safety of the officers or others," 490 U.S. at 396, "is undoubtedly the most important and fact intensive factor in determining the objective reasonableness of an officer's use of force," *Pauly*, 874 F.3d at 1216 (internal quotation marks omitted). Because Agent Trimmer used deadly force, her use of such force is only justified "if a reasonable officer in [her] position would have had probable cause to believe that there was a *threat of serious physical harm to* [*herself*] *or to others*." *Estate of Larsen*, 511 F.3d at 1260 (emphasis in original). (*See also* ECF No. 62 at 12 n.12 (discussing how it is undisputed that Agent Trimmer's gunfire constituted deadly force).)

"Indeed, even if an officer reasonably, but mistakenly, believed that a suspect

15

was likely to fight back . . . the officer would be justified in using more force than in fact was needed.  A reasonable officer need not await the 'glint of steel' before taking self-protective action; by then, it is often . . .  too late to take safety precautions." *Estate of Larsen*, 511 F.3d at 1260 (internal citation and quotation marks omitted) (alteration incorporated).  Moreover, "if threatened by weapon . . . , an officer may use deadly force." *Thomas v. Durastanti*, 607 F.3d 655, 664 (10th Cir. 2010).

In evaluating the degree of threat facing an officer, the Tenth Circuit looks to the four component test first highlighted in *Estate of Larsen*:

> (1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect.

511 F.3d at 1260; *see also Pauly*, 874 F.3d at 1216.  The Court will address each component in turn.

a.     *The First Larsen Component*

Under the first *Larsen* component, courts are to consider "whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands."  511 F.3d at 1260.  In the briefing before Judge Varholak, St. George argued that the LPD officers had plenty of time to identify themselves and order him to drop his weapon during the nearly six minutes between the time he exited his residence and pumped the action of his shotgun and when Agent Trimmer shot him.  (ECF No. 62 at 12–13.)  The Recommendation discussed how, although no warning was given during that time frame, the officers had called St. George six times and had identified

themselves as police officers during several of those calls.  (*Id*. at 13.)  The Recommendation further noted that when the officers told St. George to exit the residence without anything in his hands, he responded that he had something in his hands and then proceeded to exit with a shotgun.  (*Id*.)

Thus, the Recommendation found that "[r]easonable officers on the scene would have no reason to believe that Plaintiff would yield to their commands on this occasion when he . . . had just directly ignored the command to exit the building without anything in his hands and instead exited with a shotgun."  (*Id*.)  Therefore, the Recommendation found that the "officers may have feared calling out to Plaintiff and thereby identifying their location to the potential shooter."  (*Id*.)  As a result, the Recommendation concluded that although the officers did not order St. George to drop his weapon, his defiance of the officers' earlier order to exit without anything in his hands rendered the first *Larsen* component, at best, neutral to St. George's position.  (*Id*. at 13–14.)

In the Objection, St. George makes a variety of arguments as to why the first *Larsen* component should weigh "heavily" in his favor.  (*See* ECF No. 63 at 5–8.)  At the outset, St. George argues that the Court's analysis of this component need only address how he was never ordered to drop his weapon before he was shot.  (*Id*. at 5.)  St. George also discusses how the officers "had missed their opportunity to make a legitimate contact with an unarmed Plaintiff" when he initially went outside without a weapon at 12:30 a.m.  (*Id*. at 6.)

In addressing the Recommendation's discussion about how the officers had called him six times and had identified themselves as law enforcement during several of

17

those calls, St. George argues that he has not found any case law "where police identification by telephone is recognized as positive identification of a police officer." (*Id*. at 5.)  Rather, St. George asserts that the officers' self-identification would have been sufficient to establish themselves as law enforcement officers if it was coupled with additional circumstantial evidence.  (*Id*. at 5–6.)  St. George argues, however, that "the Defendants withheld all of the circumstantial evidence" by (1) using a blocked number to call him; (2) parking their police vehicles out of sight; (3) not shouting police commands; and (4) not showing him their police uniforms and badges.  (*Id*. at 6.)  In addition, St. George discusses how the officers did not order him to drop his weapon over the phone, even though the officers had placed six calls to him.  (*Id*.)

St. George also asserts that he implicitly asked the officers to prove that they were indeed law enforcement officers.  (*Id*.)  In support, St. George discusses how the officer from the third phone call stated that St. George appeared to be "upset, unsettled, and paranoid" and that he did not believe that the call was from the police.  (*Id*.)  Moreover, St. George claims that he made "an outright demand for proof" that the officers were indeed with the LPD when he told an officer during the sixth phone call: "You aren't (out) there."  (*Id*. (parenthetical in original).)  In addition, St. George claims that the Recommendation ignored how he "had already been diligent in his attempts to confirm police presence [by] looking outside for police, and stepping outside for 1 min 22 sec."  (*Id*. at 6–7 (internal citations omitted).)  Moreover, St. George discusses how Agent Trimmer had "ample opportunity" to order him to drop the weapon during the nearly six minutes between the time he exited his residence and pumped the action of

his shotgun and when Agent Trimmer shot him.  (*Id*. at 7–8.)

Finally, St. George objects to the Recommendation's finding that reasonable officers on the scene would have no reason to believe that he would yield to their commands when he had just directly ignored their command to exit the residence without anything in his hands.  (*Id*. at 7.)  In particular, St. George argues that "[r]easonable officers would have recognized that Plaintiff had answered a call from a blocked Caller ID at half past midnight, had freely talked for minutes, [and] had exited front and backyard doors in cooperative compliance."  (*Id*.)  St. George claims that the Defendants "knew or reasonably ought to have known that an announcement would have earned trust and additional compliance."  (*Id*.)

 At the current motion-to-dismiss stage, it is undisputed that Agent Trimmer did not order St. George to drop his weapon, identify herself, or warn him that she was going to shoot.  However, "some warning," if "feasible," "must be given before an officer uses deadly force."  *Samuel v. City of Broken Arrow*, 506 F. App'x 751, 754 (10th Cir. 2012) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985)); *see also Cordova v. City of Albuquerque*, 816 F.3d 645, 660 (10th Cir. 2016) ("Where feasible, an officer is required to warn a suspect that he is going to shoot before doing so.")  Since no warning was given by Agent Trimmer, the Court must analyze whether it was *feasible* for Agent Trimmer to provide St. George with some degree of warning.

The Court's analysis begins when St. George exited his premises with a shotgun at 12:38 a.m.  (¶ 35; *see also* ECF No. 63 at 6 ("There was no need for Defendants to order Plaintiff to drop his weapon" before 12:38 a.m. because "he had none, and the

Defendants knew this.").) Once outside, St. George "loudly pumped the action of his shotgun," causing Agent Trimmer to radio: "Did you hear that gun rack?" (¶ 36.) St. George remained in his backyard until 12:43 a.m., when he began to walk to the front of the building. (¶ 42.) Seconds later, Sergeant Maines radioed: "Alright Devon (Trimmer), he's coming East, he's walkin' fast, straight towards you." (¶¶ 42–43 (parenthetical in original).) Agent Trimmer heard "the sound of crunching gravel and footfalls," and then observed St. George "walking through the communal driveway" at the front of his residence, with his shotgun "pointed downward in the 'low ready' condition." (¶¶ 45–46.) When St. George came into Agent Trimmer's view, she "opened fire on him" and shot him in the leg. (¶ 47.)

Viewing these facts in the light most favorable to St. George, the Court finds that it was feasible for Agent Trimmer to provide St. George with some form of warning before she opened fire. The Court acknowledges that this was "a tense, uncertain, and rapidly evolving situation" in which courts "do not like to second-guess using the 20/20 hindsight found in the comfort of a judge's chambers." *Phillips v. James*, 422 F.3d 1075, 1084 (10th Cir. 2005). Nevertheless, at the current motion-to-dismiss stage, the Court simply cannot conclude that it was not feasible for Agent Trimmer to provide St. George with some form of warning during the nearly six minute time frame from when she heard him pump the shotgun and when she shot him in the leg. *See Pauly*, 874 F.3d at 1216 (finding the first *Larsen* component to "clearly support[ ]" the suspect when the officer "did not identify himself or order [the suspect] to drop his weapon," even though "it was feasible for [the officer] to give [the suspect] a warning during the *five-second interval* between when [the suspect] aimed the gun [in the officer's

direction] and [the officer] fired his weapon") (emphasis added).  *But see Estrada v. Cook*, 166 F. Supp. 3d 1230, 1241 (D.N.M. 2015) ("Although the record does not demonstrate that the officers ordered [the suspect] to drop his weapon, this factor may be overlooked since [the suspect] aimed this weapon directly at the officers upon their first sighting of it, all while ordering them away from his trailer.").  Because Agent Trimmer did not provide St. George with any warning, even though it was feasible for her to do so, the Court finds that the first *Larsen* component weighs in St. George's favor on the facts currently before the Court.

        b.    *The Second Larsen Component*

In assessing the second *Larsen* component, courts are to consider "whether any hostile motions were made with the weapon towards the officers."  511 F.3d at 1260.  The Recommendation analyzed this component by first discussing the context surrounding the incident.  (ECF No. 62 at 14.)  In particular, the Recommendation discussed how the officers (1) were responding to a 911 call late at night; (2) were acting on a report that St. George had fired a handgun at an individual; (3) had observed St. George acting "upset," "unsettled," and "paranoid"; and (4) had been told that St. George was "being threatening on the phone."  (*Id*.)

Against this backdrop, the Recommendation discussed how the officers instructed St. George to come outside with his hands empty, but rather than complying, St. George "exited armed with a shotgun and then loudly pumped the action of the shotgun, ejecting a live shell onto the ground."  (*Id*.)  St. George then "quickly walked from the backyard to the front side of the building—toward where Agent Trimmer was

positioned—with the shotgun in the low-ready position." (*Id*.) The Recommendation found that a "reasonable officer could interpret these actions as hostile," and therefore concluded that the second *Larsen* component favors a finding of reasonableness. (*Id*.)

In the Objection, St. George argues that he did not ignore the officers' orders to come outside with his hands empty since he had already gone outside unarmed on two prior occasions. (ECF No. 63 at 8.) St. George claims that he "had waited for 1 min and 22 sec for a genuine police presence" when he was outside at 12:30 a.m., and that a "reasonable officer would have contacted [him] during this time." (*Id*.) St. George further argues that he "did not, and could not have known where, or even if, police were present, and thus could not make hostile motions toward them." (*Id*.)

In addition, St. George claims that his actions were "cautious and defensive" and "not aggressive or hostile" because (1) he did not carry his weapon in a "hostile stance" but "downward in the 'low ready' condition"; (2) after exiting his residence he did not "immediately start around his building"; and (3) Agent Trimmer initiated the "hostile opening of fire." (*Id*.) Thus, St. George asserts that "he made no hostile motions toward the Defendants," and that a "reasonable officer on the scene would have recognized that the Plaintiff was reacting to the frightening situation that the officer[s] had created, and worked to correct the situation." (*Id*.) As a result, St. George avers that the second *Larsen* component weighs heavily in his favor. (*Id*.)

The Court acknowledges that this factor is commonly found to weigh in the officer's favor when a suspect points his weapon at an officer or in an officer's direction prior to the use of deadly force. *See, e.g.*, *Pauly*, 874 F.3d at 1216 ("The second

*Larsen* component . . . weighs in favor of [the officer] because the record reflects that [the suspect] pointed a handgun at [the officer] or at least in his direction."); *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1319 (10th Cir. 2009) (finding the second *Larsen* component to weigh in the officers' favor when the suspect "made hostile motions; he aimed his weapon at the officers after having previously stated that he was going to pull the trigger"). The Court recognizes that there are no factual allegations before the Court that St. George pointed his weapon at Agent Trimmer before he was shot. Nonetheless, when examining St. George's actions leading up to Agent Trimmer's gunfire, the Court finds that St. George took hostile actions with his weapon towards the officers.

This incident arose when officers responded to a 911 call that St. George made "illicit sexual contact" with an individual and that he had fired two gunshots during the incident, with the second gunshot aimed at the individual. (¶ 11.) Once on scene, the officers called St. George six times and spoke with him for a total of 13 minutes and 31 seconds. (¶¶ 17, 19, 21–22, 24, 32–33.) During these phone calls, the officers identified themselves as being law enforcement officers and instructed St. George "to come outside to talk to [the] Police." (¶¶ 19, 22, 32.) The officers reported that St. George was "upset," "unsettled," and "paranoid," and was "being threatening on the phone." (¶¶ 23, 33.)

During the sixth and final phone call, an officer told St. George to go outside "with nothing in his hands," to which St. George responded, "I have something in my hands." (¶ 33.) St. George then went into his backyard with a shotgun. (¶ 35.) Once outside, St. George "loudly pumped the action of his shotgun, ejecting a live shell onto

the ground." (¶ 36.)  The officers heard St. George pump the shotgun and knew he was now outside with a gun, but they had difficulty in determining his location because it was dark outside.  (¶¶ 36, 38, 41.)  St. George then began to quickly walk, with his shotgun in the low ready position, to the front of his residence where the officers were hiding.  (¶¶ 38–39, 42–43, 45–46.)  When St. George encountered Agent Trimmer, she shot him in the leg.  (¶ 47.)

Based on this sequence of events, the Court finds that a reasonable officer could interpret St. George's actions with his shotgun to be hostile.  While St. George did not point the shotgun at Agent Trimmer before she fired, the Court finds that his actions were more than enough for a reasonable officer to determine that St. George's actions were hostile in nature.  Notably, a "reasonable officer need not await the 'glint of steel' before taking self-protective action," *Estate of Larsen*, 511 F.3d at 1260, and "if threatened by weapon . . . , an officer may use deadly force," *Thomas*, 607 F.3d at 664.

The Court acknowledges that it has not been able to locate a case where the suspect's hostile motions were similar to St. George's actions.  Nonetheless, it has found several instances where courts have found the second *Larsen* component to weigh in the officer's favor in situations where the suspect's actions were likely less hostile than St. George's actions.  *See e.g.*, *James v. Chavez*, 830 F. Supp. 2d 1208, 1276 (D.N.M. 2011), *aff'd*, 511 F. App'x 742 (10th Cir. 2013) (finding that the suspect had made hostile motions towards the officers when "he was waiving the knife around at various points," even though he "had not tried to use the knife on the officers"); *Wood v. Farmington City*, 910 F. Supp. 2d 1315, 1326 (D. Utah 2012) (finding that the suspect

24

had "made hostile motions with the gun—motioning the gun from side to side"); *Estate of Taylor v. Salt Lake City*, 2019 WL 2164098, at *25 (D. Utah May 17, 2019) ("A reasonable officer . . . would believe [(albeit mistakenly)] that [the suspect's] sudden 'draw stroke' motion with his hands was a hostile motion made with a weapon towards the officers."). In this case, St. George had been contacted by law enforcement officers on multiple occasions and told to come outside unarmed to talk to the police. St. George decided to go out into his backyard in the middle of the night wielding a shotgun in the low ready position, before quickly making his way to the front of the house where the police were hiding. Accordingly, the Court finds that the second *Larsen* component weighs in Agent Trimmer's favor.

      c.    *The Third Larsen Component*

The third *Larsen* component looks to "the distance separating the officers and the suspect." 511 F.3d at 1260. In analyzing this component, the Recommendation discussed how "neither the Third Amended Complaint nor the Affidavit submitted therewith describe the exact distance between Plaintiff and Agent Trimmer when Agent Trimmer fired her weapon." (ECF No. 62 at 15.) The Recommendation noted, however, that the Affidavit acknowledges that St. George "was walking quickly from the backyard to the front side of the building—toward where Agent Trimmer was positioned—with his shotgun in the low-ready position." (*Id.*) Nonetheless, the Recommendation found that given the lack of specific information about the distance between the officers and St. George, the third *Larsen* component was, at best, neutral to St. George's position. (*Id.*)

In the Objection, St. George argues that the Court should not analyze this component by looking at the actual distance separating the officers and St. George, but rather should analyze this component by looking at the circumstances. (ECF No. 63 at 9.) St. George then discusses how the "Defendants [we]re around the corner of a building and behind a truck from him." (*Id*.) St. George asserts that what matters for this component "is not distance in feet, as any reasonable person would agree that firearms can cover substantial range in terms of distance in feet . . . [but] cannot . . . shoot around corners, or readily through trucks." (*Id*.) St. George then argues that the Defendants "do not capitalize" on the distance separating them from St. George, "rather, they lie in wait while Plaintiff closes the separation, walking toward the front of his building." (*Id*.) Thus, St. George avers that this factor is favorable to him, and not merely neutral. (*Id*.)

While it is unclear how far St. George was from Agent Trimmer when he was shot, St. George's factual allegations firmly support the finding that the distance was minimal. After hearing St. George pump the shotgun, Agent Trimmer moved around the east side of the residence and hid behind a truck at the front of the building, apparently parked next to the garage in the communal driveway. (¶¶ 38–39, 43, 46–47, 49.) At 12:43 a.m., St. George began to walk from the backyard to the front of the building around the east side of the residence, causing Sergeant Maines to radio: "Alright Devon (Trimmer), he's coming East, he's walkin' fast, straight towards you." (¶¶ 42–43 (parenthetical in original).) Agent Trimmer then "heard the sound of crunching gravel and footfalls," and observed St. George "walking through the communal driveway." (¶¶ 45–46.)

26

At 12:44 a.m., St. George "came into her view" and Agent Trimmer shot him in the leg. (¶ 47.) St. George then returned fire from the street but "his shotgun pellets struck the garage door above Trimmer's location." (¶¶ 48–49.) Agent Trimmer then retreated around the truck, and St. George fired another shot from the "end of the communal drive." (¶¶ 50–51.) St. George then fell on his back in the grass next to the communal drive and then fired several shots at another officer. (¶¶ 46, 53, 55–56.) Approximately "35 seconds" after Agent Trimmer fired upon him, an officer radioed: "He looks wounded, he's on the ground, he's still shooting the shotgun." (¶ 58.) By 12:45 a.m., St. George was back inside his residence. (*Id*.)

Viewing these factual allegations in the light most favorable to St. George, it appears clear that the distance separating St. George and Agent Trimmer was minimal. Indeed, St. George's allegations provide that (1) he was closing the distance between himself and the officers as he walked to the front yard; (2) he was walking straight towards Agent Trimmer in the dark; (3) she could hear the crunching of gravel beneath his feet and his footfalls; (4) she observed him walking through the communal driveway with a shotgun in low ready position; (5) she fired at him from next to a car parked in the communal driveway when he "came into her view"; and (6) the whole firefight occurred in the communal driveway (or at least very close by) and lasted only approximately 35 seconds. In the Objection, St. George does not argue that this factor should weigh in his favor as there was an appreciable distance separating him and Agent Trimmer. (*See* ECF No. 63 at 9.) Instead, he argues that the distance separating them should not matter as a firearm cannot shoot around corners or readily through trucks. (*Id*.)

While the Court has not been able to locate a case on point, the Court has found

27

several cases to provide insight.  For instance, in weighing the third *Larsen* component, the court in *McHenry v. City of Ottawa* found that "the danger presented by a gun—the weapon that at least some officers believed [the suspect] had in his waistband [(instead of sunglasses)]—tips the balance toward the officers," even though the officers were 30 yards away from the suspect.  2017 WL 4269903, at *8 (D. Kan. Sept. 26, 2017).  The court found, however, that "other alleged facts support the opposite side of the scale"—namely, the "officers occupied sheltered positions and no facts . . . suggest that [the suspect] was closing the distance or otherwise nullifying the shelter that the officers occupied."  *Id*.

The court in *Estrada v. City of Las Cruces* discussed the importance of whether the officer or the suspect advanced towards the other.  2010 WL 11626773, at *6 (D.N.M. Jan. 12, 2010).  The court found the third *Larsen* component to weigh in the suspect's favor when "it was the officers who closed the distance on [the suspect]," rather than vice versa.  *Id*.  Moreover, the court noted that when "a suspect is wielding a gun, the danger to [the] officer is more immediate because [s]he can be struck from a greater distance than with a knife, and for that reason, it is reasonable for an officer to respond more immediately with deadly force."  *Id*. at *5 (citing *Thomson*, 584 F.3d at 1318; *Walker v. City of Orem*, 451 F.3d 1139, 1159–61 (10th Cir. 2006)).

In the case at hand, St. George was wielding a shotgun in the dark as he closed the distance between himself and Agent Trimmer, neutralizing the effectiveness of her hiding spot.  In addition, Agent Trimmer knew he was carrying a shotgun.  Moreover, the facts firmly support the finding that St. George was in Agent Trimmer's immediate

vicinity when she fired.  As a result, the Court finds that the third *Larsen* component weighs in Agent Trimmer's favor.

        d.    *The Fourth Larsen Component*

The fourth *Larsen* component considers "the manifest intentions of the suspect." 511 F.3d at 1260.  In analyzing this component, the Recommendation discussed how St. George ignored commands to come out with his hands empty, and instead chose to go outside with a shotgun.  (ECF No. 62 at 15.)  Once outside, St. George loudly pumped the action of the shotgun before walking quickly around the building with the shotgun in the low-ready position.  (*Id*.)  The Recommendation found that a "reasonable officer faced with this situation could conclude that Plaintiff was manifesting his intent to harm the officers," and therefore determined that the fourth *Larsen* component supports Agent Trimmer.  (*Id*.)

In the Objection, St. George's primarily bases his arguments on the Tenth Circuit's analysis of the fourth *Larsen* component in *Pauly*, 874 F.3d at 1219.  (ECF No. 63 at 9–10.)  As previously mentioned, the suspect in *Pauly* was involved in a road rage incident with two females on an interstate highway.  874 F.3d at 1203.  By the time Officers White, Mariscal, and Truesdale had arrived at the scene, the suspect had already proceeded to the house where he lived with his brother, which was located in a rural wooded area behind another residence.  *Id*.  Although the officers all agreed that they did not have enough evidence or probable cause to arrest the suspect, they decided to proceed to the address where the suspect's car was registered "to try and speak with [the suspect] to get his side of the story, 'to make sure nothing else

happened,' and to find out if he was intoxicated." *Id*. at 1203–04.

It was dark and raining outside by the time the officers arrived at the suspect's address at 11:14 p.m. *Id*. at 1204. The officers did not see the suspect's car at the main house, but they did see lights on at a second house located behind the main house. *Id*. The officers decided to approach the second house but "did not activate their security lights" and advanced in a manner such that the occupants of the second house did not know the officers were on the property. *Id*. As the officers got closer to the brothers' house, they used their flashlights intermittently and located the suspect's vehicle. *Id*. Through the front doors, the officers could see two males moving inside the house. *Id*.

The following is the Tenth Circuit's account of what transpired:

> From the . . . brothers' perspective, the officers' approach to their residence was confusing and terrifying. The brothers could see "through the front window two blue LED flashlights, five or seven feet apart, at chest level, coming towards the house." [The suspect] could not tell who was holding the flashlight approaching the house because of the dark and the rain, but he feared it could be intruders related to the prior road rage altercation. "[I]t did not enter [the suspect's] mind that the figures could have been police officers." The brothers hollered several times, "Who are you?" and, "What do you want?" In response, the officers laughed and said: "Hey, (expletive), we got you surrounded. Come out or we're coming in." Officer Truesdale also shouted once, "Open the door, State Police, open the door," while Officer Mariscal said, "Open the door, open the door." But [the suspect] did not hear anyone say "State Police" until after the entire altercation was over.
>
> Fearing for their lives and the safety of their dogs, the brothers decided to call the police to report the unknown intruders. Before [the suspect] could call 911, however, he heard someone yell: "We're coming in. We're coming in."

30

Believing that an invasion of their home was imminent, [the brother] retrieved a loaded handgun for himself as well as a shotgun and ammunition for [the suspect]. [The suspect] told his brother he would fire some warning shots while [the brother] went back to the front of the house. One of the brothers then hollered, "We have guns," and the officers subsequently saw an individual run to the back of the house. Officer Truesdale proceeded to position himself towards the rear of the house and shouted, "Open the door, come outside," while Officer White drew his weapon and took cover behind a stone wall fifty feet away from the front of the house and Officer Mariscal took cover behind one of the brothers' trucks.

Because of the prior threatening statements made by Officer Truesdale and Mariscal, [the suspect] did not feel comfortable stepping out of the front door to fire warning shots. But a few seconds after the officers heard "We have guns," [the suspect] stepped partially out of the back door and fired two warning shots while screaming loudly to scare anyone off. Officer White thought Officer Truesdale had been shot after hearing the two shotgun blasts. A few seconds after [the suspect] fired the warning shots, Officers Mariscal and White observed [the brother] open the front window and point a handgun in Officer White's direction. Officer Mariscal testified he immediately shot at [the brother] but missed. "Four to five seconds after [the brother] pointed his handgun at Officer White, Officer White shot [the brother]" from his covered position fifty feet away. The entire incident took less than five minutes.

*Id*. at 1204–05.

In analyzing the fourth *Larsen* component, the Tenth Circuit found that "a reasonable jury could find that the Officers provided inadequate police identification by yelling out 'State Police' once, and it would have been reasonable for the Officers to conclude that [the suspect] could believe that persons coming up to his house at 11:00 p.m. were connected to the road rage incident which had occurred a couple of hours previously." *Id*. at 1219 (internal quotation marks omitted). Thus, the Tenth Circuit

31

found that "the manifest intention of the brothers was to protect their home [from ostensible home invaders] after inadequate identification from the officers, which was their legal right under both the United States Constitution and New Mexico state law." *Id*.

The arguments contained St. George's Objection largely parrot the Tenth Circuit's analysis in *Pauly*. (See ECF No. 63 at 9–10.) In particular, St. George argues "a reasonable jury could find that the Officers provided inadequate police identification [by calling on the telephone without giving any coupled circumstantial evidence] and it would be reasonable for officers to conclude that [St. George] could believe that persons [calling him on the cell phone from a blocked ID and claiming to be outside leering in his windows at quarter-past midnight] were connected to the [escort] incident which had occurred a couple of hours previously." (*Id*. (alterations in original).) Thus, St. George argues that it was his manifest intention to protect his home from "ostensible home invaders," which was his legal right under both the United States Constitution and Colorado state law. *Id*. St. George also argues that a "reasonable officer on the scene could equally have determined that the Plaintiff's manifest intention was to leave to a place of safety . . . [or] to look out front for strangers or strange vehicles." (*Id*. at 10.) Thus, St. George alleges that this component weighs in his favor.

The Court finds St. George's arguments to be unconvincing. Indeed, even a cursory review of the facts of *Pauly* and this lawsuit makes abundantly clear that the two cases are dissimilar. For example, the Tenth Circuit in *Pauly* found that the officers provided inadequate police identification by only yelling out "State Police" once, while

another officer was also shouting commands.  In the case at hand, however, the officers called St. George on six separate occasions, and identified themselves as police officers during every call St. George answered.  Moreover, in *Pauly*, the incident happened in a rural wooded area a distance from the underlying 911 call and there are no facts indicating that the suspect had any idea that the other car in the road rage altercation had called the police.  In the instant case, however, the incident happened at the same location as the underlying 911 call and St. George even acknowledges that he anticipated that a neighbor might have contacted the police after hearing his gunfire.  Thus, the officers here provided considerably more police identification than the officers in *Pauly*, and cannot reasonably be deemed to have provided "inadequate police identification."

Moreover, in *Pauly*, the brothers had ample reason to believe that the persons coming up to their house at 11:00 p.m. were home invaders connected to the road rage incident which had occurred a couple of hours prior.  As previously mentioned, there are no facts indicating that the brothers knew the police would be at their house, which was located in a rural wooded area and thus heightened the brothers' concern about intruders.  Moreover, when the brothers shouted several times, "Who are you?" and, "What do you want?," the individuals outside laughed and said: "Hey, (expletive), we got you surrounded.  Come out or we're coming in."  *Pauly*, 874 F.3d at 1204.  In the case at hand, however, St. George anticipated that police officers would be called by his neighbors.  Once the officers arrived, they called him on six separate occasions and identified themselves as police officers during every call he answered.  St. George did not attempt to confirm the identity of the officers or contact the officers outside.  Thus,

St. George had very little reason, if any, to believe that he was protecting his home from home invaders when he exited his residence wielding a shotgun.

The Court finds that it need not address the other many apparent dissimilarities between *Pauly* and the case at hand as it is clear that St. George's manifest intentions were hostile towards the officers. (*See* ECF No. 62 at 16–17 n.4.) St. George had already fired a bullet in the air while confronting the escort and then proceeded to aim his gun at her. *See Estate of Larsen*, 511 F.3d at 1260. When the officers told St. George to come outside with his hands empty, he responded that he had something in his hands and then went outside with a shotgun. Once outside, he pumped the action of the shotgun and ejected a live round. After not encountering anyone in the backyard, St. George quickly made his way to the front yard with his shotgun in the low ready position.

Although more is surely not needed in this regard, the Court notes that St. George did not drop his weapon or surrender after being shot in the leg by Agent Trimmer, but instead escalated the gunfight by firing two rounds at the officer. When St. George encountered the next police officer, he immediately fired three rounds at the officer. After retreating into his home, St. George apparently fired an additional four rounds from inside his residence, including one into the ceiling outside his front door when the door was opened by officers. As a result, the Court finds that St. George's manifest intent was to harm the officers and therefore the third *Larsen* component weighs heavily in Agent Trimmer's favor.

        e.    *Summary of the Second Graham Factor*

The Recommendation concluded that "[a]fter weighing the *Larsen* factors, and considering the entirety of the situation facing Agent Trimmer based on the information available to Agent Trimmer at the time, . . . the second *Graham* factor favors a finding of reasonableness." (ECF No. 62 at 15.) The Court agrees. After being told by police officers to come outside with his hands empty, St. George proceeded to go outside in the dark with a shotgun, where he pumped the shotgun's action before briskly walking to the front of the house with the gun at the low ready position. These actions make abundantly clear that St. George posed an immediate and significant threat to the safety of Agent Trimmer and the other officers at the scene. *Graham*, 490 U.S. at 396. As a result, the Court finds that the second *Graham* factor weighs in Agent Trimmer's favor.

3.  The Third *Graham* Factor

Under the third *Graham* factor, courts are to consider "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396. In analyzing this factor, the Recommendation discussed how the officers may not have initially intended to arrest St. George, but instead only wanted to talk to him about the events that occurred earlier in the evening. (ECF No. 62 at 16.) In support, the Recommendation noted that the officers did not have in their possession an arrest warrant and that they told St. George to come outside to just talk. (*Id*.) Thus, the Recommendation found that St. George's "refusal to come outside may not have been an active resistance to arrest or an attempt to evade arrest by flight." (*Id*.)

The Recommendation went on to discuss, however, how St. George disobeyed

the officers' command to exit the residence with his hands empty when he left his home with a shotgun, and how "Courts in similar circumstances have found such refusals to favor the officer when evaluating the third *Graham* factor." (*Id*. at 17.) Nevertheless, the Recommendation concluded that, "given the uncertainty in the Third Amended Complaint regarding the LPD officers' intent with respect to arresting Plaintiff, the third *Graham* factor slightly favors Plaintiff." (*Id*.)

In the Objection, St. George states that although he "disagrees with the Magistrate's analysis," he will "not beleaguer the point" because the Recommendation found the factor to weigh in St. George's favor. As a result, the Court reviews the Recommendation's findings regarding the third *Graham* factor for clear error. *See 2121 East 30th St.*, 73 F.3d at 1060 ("[A] party's objections to the magistrate judge's report and recommendation must be both timely *and specific* to preserve an issue for *de novo* review by the district court") (emphasis added).

The Court finds that Judge Varholak's analysis was thorough and sound, and that there is no clear error on the face of the record. *See Bertolo v. Benezee*, 2013 WL 1189508 (D. Colo. Mar. 22, 2013) (district court reviewing for clear error where no specific objections were made to a recommendation), *aff'd*, 601 F. App'x 636 (10th Cir. 2015). Therefore, the Court finds that the third *Graham* factor weighs slightly in St. George's favor.

    4.    Summary of the *Graham* Factors

The Recommendation found the first and second *Graham* factors to clearly favor Agent Trimmer, but the third factor to slightly favor St. George. (ECF No. 62 at 18.)

The Recommendation determined, however, that the third factor was insufficient to overcome the other two factors, especially since the second factor is the most important factor in determining the reasonableness of an officer's use of force.  (*Id*.)  As a result, Judge Varholak recommended that St. George's excessive force claim against Agent Trimmer be dismissed with prejudice.  (*Id*.)

Examining the totality of the circumstances, viewed in the light most favorable to St. George, the Court finds that a reasonable officer in Agent Trimmer's position would have had probable cause to believe that St. George posed an immediate threat of serious physical harm to herself and potentially to other officers at the scene, especially Sergeant Maines who was hiding in a nearby bush.  *Estate of Larsen*, 511 F.3d at 1260. Therefore, Agent Trimmer's use of deadly force was not objectively unreasonable and did not violate St. George's constitutional right to be free from excessive force.  *See id*. at 1260–61.  For all these reasons, the Court will grant Defendants' Motion to Dismiss as to St. George's excessive force claim against Agent Trimmer.  Because the Court is not convinced that St. George could never allege sufficient facts to plausibly plead an excessive force claim against Agent Trimmer, this dismissal will be without prejudice.

## C.     Claims Against Sergeant Maines, Chief McCasky, and the City of Lakewood Based on Agent Trimmer's Excessive Force

St. George also brings three claims related to his excessive force claim against Agent Trimmer—namely, claims for (1) failure to prevent excessive force against Sergeant Maines (ECF No. 14-1 at 10–11); (2) supervisory liability for excessive force against Chief McCasky (*id*. at 17–18); and (3) municipal liability for excessive force against the City of Lakewood (*id*. at 19–20).  (*See also* ECF No. 62 at 5; ECF No. 54

at 1–2.)

In the Recommendation, Judge Varholak discussed how these three claims are premised on Agent Trimmer's alleged use of excessive force. (ECF No. 62 at 19.) The Recommendation found that because St. George had failed to allege an unconstitutional use of force by Agent Trimmer, these three claims were deficient and therefore could not survive the Motion to Dismiss. (*Id*.) Accordingly, Judge Varholak recommended that these three claims be dismissed with prejudice. (*Id*. at 19–20.)

In his Objection, St. George merely states:

> Plaintiff objects to this recommendation on the grounds that Trimmer's conduct, when viewed in the light most favorable to the Plaintiff, substantiates a Constitutional violation. This Court shall make findings in accordance with the presumption that Trimmer did violate Plaintiff's Constitutional rights, as she has done.

(ECF No. 63 at 11–12.) That is the extent that St. George objects to Judge Varholak's recommendation that these three claims be dismissed with prejudice. (*Id*.; *see generally* ECF No. 63.)

As a result the Court reviews that portion of the Recommendation for clear error, and finds none. *See 2121 East 30th St.*, 73 F.3d at 1060; *Bertolo*, 2013 WL 1189508, at *1. Accordingly, the Court will dismiss with prejudice St. George's supervisory liability for excessive force claim against Chief McCasky and municipal liability for excessive force claim against the City of Lakewood. Because the Court is not convinced that St. George could never allege sufficient facts to plausibly plead the failure to prevent excessive force claim against Sergeant Maines, the claim will be dismissed without prejudice.

## V. DUE PROCESS CLAIMS

In the Third Amended Complaint, St. George asserts due process claims against each Defendant.  (*See generally* ECF No. 14-1.)  The Recommendation noted that while the genesis of St. George's due process claims was not entirely clear, they appeared to be premised on two theories: (1) St. George was denied due process because Defendants did not follow LPD policies (ECF No. 14-1 at 7–8, 11–12, 14–16, 18–19, 20–21); and (2) St. George was denied due process during his criminal proceedings because Defendants perjured themselves or withheld evidence (*id*. at 7–8, 12, 14–16, 18–19, 21).  (ECF No. 62 at 20.)  In the Objection, St. George does not dispute this finding.  (*See generally* ECF No. 63.)  Thus, the Court finds that St. George's due process claims are based on these two theories, and will address each in turn.

### A.    First Set of Due Process Claims—Failure to Follow LPD Policies

In the Recommendation, Judge Varholak discussed how the "Tenth Circuit has held that law enforcement's violation of its own policies does not state a constitutional claim."  (ECF No. 62 at 20 n.8 (citing *Gaines v. Stenseng*, 292 F.3d 1222, 1225 (10th Cir. 2002); *Hovater v. Robinson*, 1 F.3d 1063, 1068 n.4 (10th Cir. 1993)).)  The Recommendation noted that even if "Defendants' alleged violations of LPD policies could somehow give rise to a due process claim, the Third Amended Complaint contains only conclusory statements concerning the manner in which Defendant's supposedly violated LPD policies."  (*Id*. at 20.)  The Recommendation found that to the extent the Third Amended Complaint provides any detail about policy violations, it fails

to state a claim because the policy violations are premised on Agent Trimmer's alleged excessive use of force—which the Recommendation found to be constitutional. (*Id*. at 20–21.)

As a result, Judge Varholak recommended that St. George's due process claims premised on Agent Trimmer's use of excessive force in violation of LPD policies be dismissed with prejudice. (*Id*. at 21.) Although not explicitly stated, it appears that Judge Varholak also implicitly recommended that St. George's other due process claims based on the Defendant's failure to follow LPD policies—*i.e.*, claims not premised on Agent Trimmer's use of excessive force—also be dismissed with prejudice. (*See id*. at 20–21.)

Pursuant to a liberal reading of the Objection, the Court can only discern one argument addressing the Recommendation's findings in regard to these claims: St. George argues that Agent Trimmer's conduct amounted to a constitutional violation and that the Court must make findings in accordance with that presumption. (ECF No. 63 at 11–12.) That is the extent to which St. George objects to Judge Varholak's recommendation that his due process claims based on Defendants' failure to follow LPD policies be dismissed with prejudice. (*See generally* ECF No. 63.)

As a result the Court reviews that portion of the Recommendation for clear error, and finds none. *See 2121 East 30th St.*, 73 F.3d at 1060; *Bertolo*, 2013 WL 1189508, at *1. Accordingly, the Court will dismiss with prejudice St. George's due process claims premised on Defendants' failure to follow LPD policies.

**B.      Second Set of Due Process Claims—Withholding of Evidence & Perjury**

In the Recommendation, Judge Varholak determined that St. George's due

process claims premised on Defendants' alleged perjury or withholding of evidence in

his criminal trial were precluded by *Heck v. Humphrey*, 512 U.S. 477 (1994).  (ECF

No. 62 at 21.)  In *Heck*, the Supreme Court held

> that, in order to recover damages for allegedly
> unconstitutional conviction or imprisonment, or for other
> harm caused by actions whose unlawfulness would render a
> conviction or sentence invalid, a § 1983 plaintiff must prove
> that the conviction or sentence has been reversed on direct
> appeal, expunged by executive order, declared invalid by a
> state tribunal authorized to make such determination, or
> called into question by a federal court's issuance of a writ of
> habeas corpus, 28 U.S.C. § 2254.  A claim for damages
> bearing that relationship to a conviction or sentence that has
> not been so invalidated is not cognizable under § 1983.
>
> Thus, when a state prisoner seeks damages in a § 1983
> suit, the district court must consider whether a judgment in
> favor of the plaintiff would necessarily imply the invalidity of
> his conviction or sentence; if it would, the complaint must be
> dismissed unless the plaintiff can demonstrate that the
> conviction or sentence has already been invalidated.

512 U.S. at 486–87.

The Recommendation found that because a judgment in St. George's favor on

his due process claims based on perjury and withholding of evidence by Defendants in

his criminal trial would necessarily imply the invalidity of his conviction—and because

St. George had not demonstrated that his conviction has already been invalidated—the

claims were barred by *Heck*.  (ECF No. 62 at 21–24.)  Therefore, Judge Varholak

recommended that these due process claims be dismissed without prejudice and that

St. George should be granted leave to refile the claims should his criminal conviction be

overturned.  (*Id*. at 24.)

In the Objection, under the title "**Claims presumably barred by Heck**,"
St. George states: "As the Magistrate has recommended these claims [be] dismissed
without prejudice, the Plaintiff shall deem those claims *in toto* to be preserved for
pursuit once his criminal conviction has been overturned."  (ECF No. 63 at 12
(emphasis in original).)  That is the extent to which St. George addresses Judge
Varholak's recommendation that his due process claims premised on the Defendants'
alleged perjury or withholding of evidence in his criminal trial be dismissed.  (*See
generally* ECF No. 63.)

As a result the Court reviews that portion of the Recommendation for clear error,
and finds none.  *See 2121 East 30th St.*, 73 F.3d at 1060; *Bertolo*, 2013 WL 1189508,
at *1.  Accordingly, the Court will dismiss without prejudice St. George's due process
claims based on the Defendants' alleged perjury or withholding of evidence in his
criminal trial, and will grant St. George leave to refile the claims should his criminal
conviction be overturned.

## VI.  STATE TORT CLAIMS

In the Third Amended Complaint, St. George specifically asserts claims against
Agent Trimmer and Sergeant Maines for emotional distress by outrageous conduct and
civil fraud, and generally asserts claims against all Defendants for injury to property,
personal injury, and negligence.[4]  (*See generally* ECF No. 14-1; *see also* ECF No. 17

---

[4]  In the Motion to Dismiss, Defendants assert that St. George alleges a state tort claim
for trespass against each Defendant.  (ECF No. 30 at 16.)  However, Judge Babcock previously
dismissed these claims as legally frivolous after finding them to be criminal claims for first
degree criminal trespass.  (*See* ECF No. 17 at 4–7.)  This finding is amply supported by the

at 4–6.)  After finding that all of St. George's federal claims should be dismissed, Judge Varholak recommended that the Court decline to exercise supplemental jurisdiction over St. George's remaining state tort claims and dismiss them without prejudice.  (ECF No. 62 at 24–25.)

In the Objection, St. George "decline[d] to address the Dismissal without prejudice of his State tort claims at this time."  (ECF No. 63 at 12.)  Solely because the Court is dismissing without prejudice two of St. George's federal claims and granting him leave to file an amended complaint (as discussed below)—and not because of the merits of his state tort claims—the Court will defer the decision on whether or not to exercise supplemental jurisdiction over St. George's state tort claims at this time.

## VII.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.  The Recommendation (ECF No. 62) is ADOPTED AS MODIFIED;

2.  Plaintiff St. George's Objection (ECF No. 63) is OVERRULED;

3.  Defendants' Motion to Dismiss (ECF No. 30) is GRANTED as follows:

    a.  Plaintiff St. George's excessive force claim against Defendant Agent Trimmer (ECF No. 14-1 at 6–7) is DISMISSED WITHOUT PREJUDICE;

    b.  Plaintiff St. George's failure to prevent excessive force claim against Defendant Sergeant Maines (ECF No. 14-1 at 10–11) is DISMISSED WITHOUT PREJUDICE;

---

Third Amended Complaint—namely, in the two sections where St. George describes the "trespass," he includes the statute for first degree criminal trespass, Colo. Rev. Stat. § 18-4-502, and language from the statute on second degree criminal trespass, Colo. Rev. Stat. § 18-4-503(1)(a).  (ECF No. 14-1 at 9, 14.)

c.      Plaintiff St. George's supervisory liability for excessive force claim against Defendant Chief McCasky (ECF No. 14-1 at 17–18) is DISMISSED WITH PREJUDICE;

d.      Plaintiff St. George's municipal liability for excessive force claim against Defendant City of Lakewood (ECF No. 14-1 at 19–20) is DISMISSED WITH PREJUDICE;

e.      Plaintiff St. George's due process claims against all Defendants that are premised on Defendants' failure to follow LPD policies (ECF No. 14-1 at 7–8, 11–12, 14–16, 18–19, 20–21) are DISMISSED WITH PREJUDICE; and

f.      Plaintiff St. George's due process claims against all Defendants that are premised on Defendants' perjury and withholding of evidence (ECF No. 14-1 at 7–8, 12, 14–16, 18–19, 21) are DISMISSED WITHOUT PREJUDICE.

4.      Plaintiff St. George is GRANTED LEAVE to refile his due process claims against the Defendants that are premised on Defendants' perjury and withholding of evidence (ECF No. 14-1 at 7–8, 12, 14–16, 18–19, 21) should his underlying criminal conviction be overturned;

5.      Solely in the interest of justice, the Court *sua sponte* grants St. George leave to file a final amended complaint consistent with this Order on or before **October 11, 2019**. St. George is on notice that no further amendment will be permitted without a showing of substantial good cause arising out of truly compelling

circumstances.  If St. George elects to file a final amended complaint, such a complaint shall only include, at most, St. George's (1) excessive force claim against Defendant Agent Trimmer; (2) failure to prevent excessive force claim against Defendant Sergeant Maines; (3) state tort claims against the Defendants that are currently alleged in the Third Amended Complaint—namely, claims against Defendant Agent Trimmer and Defendant Sergeant Maines for emotional distress by outrageous conduct and civil fraud, and claims against all Defendants for injury to property, personal injury, and negligence.  The Court will not consider a claim against Defendant Dan McCasky for supervisory liability due to excessive force, a claim against Defendant City of Lakewood for municipal liability due to excessive force, or due process claims against any Defendant that is premised on Defendants' failure to follow LPD policies, as those claims have been dismissed with prejudice by the terms of this Order.  Nor will the Court consider due process claims against any Defendant premised on Defendants' alleged perjury and withholding of evidence unless and until St. George's underlying criminal conviction is overturned.  Moreover, the Court will not consider any state tort claims other than those currently alleged in the Third Amended Complaint, as listed above;

6.  If St. George does *not* file a Fourth Amended Complaint on or before **October 11, 2019**, the Court will review whether to continue to exercise supplemental jurisdiction over St. George's remaining state tort claims.  St. George is advised that the Court may, at that time, elect to decline to exercise supplemental

45

jurisdiction over his remaining state claims and, without further notice, direct the Clerk to enter judgment in favor of Defendants and terminate this case; and

7. The stay of discovery shall remain in place until further Order of Court.

Dated this 16th day of September, 2019.

BY THE COURT:

William J. Martínez
United States District Judge